v. Cynthia Fletcher v. State of Mississippi and Simpson County School District. You may proceed. Good afternoon, Your Honors. I guess first off, we want to thank you for granting us the opportunity to be here today. We are here because the plaintiff interveners believed that the district court made errors of law in fact when it granted the Simpson County School District unitary status. We hope the court will agree and remand the court for further relief. The ultimate inquiry in a school desegregation case is whether or not a school district has complied in good faith with desegregation orders and whether or not the school district has eliminated the vestiges of prior segregation. That's the Anderson case there. You left out a phrase there, to the extent possible. Thank you, Your Honor. I had it there. I just didn't read the whole thing. Thank you, Your Honor. And the burden of proof in this case is on the defendants here, and we believe they just did not meet the burden and that the evidence really showed first off and real glaringly a lack of good faith compliance by the school district. Counsel, let me start at a little bit higher elevation wise, not more exalted in other ways level. If we were to agree, but only as to two or three of the overall issues that you're raising with us, that perhaps the school district did not fully comply with the consent decree as to those, but that's all. I'm not saying that's where we are, but I'm asking you for a legal conclusion here. Where are we? Is it necessary in order for the district court to be upheld, or is it sufficient that a large percentage of the time we find, based on what the allegations are brought to us, that the district court was right and good faith compliance existed? Your Honor, you made a distinction there between compliance and good faith compliance, and those are two separate issues. And the court really takes, the law really takes seriously the good faith in the compliances. Well, I believe failure to comply if it's one or two times that we're not in good faith, that somehow affects things. If you want to make that part of the answer, that's fine. But I'm just asking an issue really regarding to, if we believe that the district court was wrong as to two things, where are we on whether that is enough to reverse the district court? Well, Your Honor, I believe that it requires a remand and that the school district is. So any particular failure to comply with the employee terms of the consent decree, even if it wasn't racially intinged, that it was one white versus another or whatever else, or a black person was hired, but it was not consistent with the consent decree, that is enough to say that this should not have been declared a unitary district and that the consent decree should stay in effect? Your Honor, first of all, we don't have to show it's motivated by race or intentional. Until the school district is declared unitary, there's a presumption that what happens, there might be race. We don't have to. There's disagreement in the parties on that, and we'll have to decide if that's right. But this is a decree under the obligation to treat children of each race and employees, the school district generally, equally. And some of what you argued, I forget what you argued, but cronyism, you thought, but had no real impact on race. And that part of the consent decree, though, is supported on the overall aspect to desegregate this school district. And the consent decree goes further than that, but because it will impact on race. So I guess too many extra issues are coming in here. I'm not getting an answer from you. Maybe you don't want to give me an answer. As to if we find that the district court was wrong on anything, we have to reverse and reinstate the consent decree? I would say yes, Your Honor, to answer your direct question. Why? What's your best case, as Judge Elvar Lux would say? Best case. Well, the Supreme Court is talking about consistency, and we've talked about consistency and compliance. My children are consistent in doing what I say, but that doesn't mean they used to be. They're all grown now. But that doesn't mean 100 percent. My law clerks are sort of consistent on doing what I say, but that doesn't mean 100 percent. Well, Your Honor, I think the record here, it's more than one, two, or three instances. But if it's only one or two, are you telling me that might be enough? I don't want you to give away the farm here, but... I think it is when, for example, in this case, you have a principal. In 2015, 2015, even after we've had a first hearing, in 2015, who totally disregards the hiring procedure, which says, you know, you get the top-rated applicants, you interview all the applicants down to a certain place where you've decided you want to stop interviewing, and then you make your decision and give the job to the highest-rated applicant. In 2015, we have a black principal who got a list of applicants, went to number 10 on the list, interviewed, and offered the job, totally disregarding the hiring procedure, which... I've kept you too long on my question. Why don't you get to what you wanted to tell us? Well, what I wanted to tell you, Your Honor, is that is so serious a violation, indicative that the school district is not really training people in the procedures, that the school district's supposed watchdog for this, the human resources person, is not really monitoring the system and probably doesn't even understand the system herself. In that instance, this instance I'm talking about, she didn't even vet all the applicants for people who are not...didn't meet the minimum qualifications. So that hire, right in and of itself, is such a blatant violation, and the district court didn't even address it in its opinion. Another blatant violation, we have an individual, highest-rated applicant, doesn't get the job, Ms. Katrina Smith. She's not mentioned by the district court either. And she had called in to say...she had interviewed for a position. She was trying to get her teacher's license. She told the interviewer, I might pass this other test to become a teacher and then I'll have a job in another district. She's just kind of telling her. Then Ms. Smith testified that she called the principal back and said, I didn't pass that part of the test, you know, I want the position. She doesn't get the position. Now, and this old erroneous information is kept on her record. Now, that wasn't mentioned by the school...by the district court either. So is it not legitimate to say, well, she's not really interested in this job, she wants this other job, and she's going to keep trying to take the test? Are all those inferences incorrect inferences underneath this...underneath the rules of the decree? Yes, Your Honor. I really believe, if you look at some of these reasons that they give for, oh, this may not be a qualified applicant, look at tab nine. There's a...of our record structures. There's an applicant down there, and her negative information is she doesn't like crowds. Now, tell me how that is relevant at all to somebody, you know, applying for a classroom or a principal's job. How do you tie that to not making the continued effort to comply? I'm sorry, Your Honor, I didn't understand your question. Well, suppose they said, you know, what you said they said. How does that tie to the big picture of desegregating the school system? Your Honor, in this case, back in 1983 when this order was put in place, it was to give everyone a chance to apply, that there be legitimate, non-discriminatory reasons given why a person doesn't get a job, giving people the opportunity. A system was put in place. What we have in 2015 is that system is in place, but it has been totally, you know, manipulated by the school district to get back to hiring whoever they want to hire. And when it comes to race, if you are a favored black, you'll get some special treatment, such as Miss, oh, I'm trying to remember her name, Deidre Clark Allen. She worked with everybody, knew everybody, and when she applied for a principalship position, she was still taking classes to be certified as an assistant principal. There were other people who were already endorsed to be principals, but she got the job. And as a matter of fact, the school district misled the Department of Justice, who asked about it, by saying, oh, the, she just doesn't have her certificate yet. They didn't say we're... How is that tied to unitary system? It's tied, Your Honor, because this manipulation of the system is returning us to exactly where we were back in 1981, the cronyism. I'm going to hire who I want. That's what Greg Pez tried to do. The new superintendent, 2016, right out of the box, violates the consent decree by wanting to hire his friend rather than the person who is most qualified, Miss Morris. Now, the violations sometimes do lead to racial... That has nothing to do with unitary system. They do, Your Honor, especially when they end up. This becomes the practice. Take whatever this system is, manipulate it to hire who you want. And there have been instances when, you know, a woman is denied a job because, you know, Mr. Pace wanted to give it to his male friend. When Katrina Smith was a white who was hired... What does that have to do with desegregation? Your Honor, in Miss Smith's case, a white was hired instead of her. This leads to racial No, Your Honor. I'm sorry. Not accidentally. To me, the school district could have put Miss Boone on the stand and had her testimony about what, you know, why she didn't give Miss Smith that job, and they didn't. The school district did not put on a lot of proof to rebut the reasons that, you know, the testifiers were giving for why they were bringing a claim or why they feel that this district should not be taken out from unitary or given unitary rule. Counsel, the district judge in this kind of proceeding is given an enormous amount of discretion. What you're talking about are fact findings and how the district judge resolved different factual issues presented, your arguments and evidence about why somebody should have been hired, the school district's evidence as to why that person wasn't hired, whatever the scenario was. So we have to overturn the district court judge despite that Judge Barber saw the witnesses, made these fact findings. And that's a very high standard. And so that's what we're starting with, a finding that the school district had done everything correctly. And you need either to chip away at that or whack it off in large chunks. And I don't think it's enough just to say there are other ways to look at the evidence. What would you say is the most significant error factually on a hire that Judge Barber made? I think that he ignored, he didn't even comment on the testimony of Principal Sanders' hiring of the girls' basketball coach, his total violation. It was so egregious that when it came out in court, everybody was kind of shocked that the school district had to go and get an affidavit and try and correct and put it in the record even after the hearing was already closed. That is really important. I think that they didn't advertise certain positions. Again, here, Tom Duncan, Deputy Superintendent. A new superintendent comes in. He wants to hire his former assistant principal, Ms. Davis. So Mr. Harris, he decides he's going to now have a new position called Associate Superintendent that he's going to move the current Deputy Superintendent into. Well, the school district says we just renamed the position and then went through the hiring process to fill a slot. Can't somebody have a position renamed without going through the consent decree? Well, the consent decree says any position has to be advertised. Well, but if you're called A one day and B the next day, but you do exactly the same thing, same duties, why do you need to go through the court and the court's consent decree? Now, you may have created a vacancy under the old duties and they hired for that. Right, Your Honor. It did create. I mean, there was by a, and they did hire. I mean, to me, that's, to me, that is an example of the manipulation of this system. Let's, you know, what William Broadhead, we'll just, he's, he got the job as an administrative assistant to the principal. We're now just going to rename him an assistant principal. Couldn't that have been, I mean, that really is kind of odd, but it sounds to me like that was a bureaucratic error of some sort. You're, from your view as the plaintiff, you think it's, it's a smoking gun. The district judge had to resolve that. Your Honor, I guess when we get so much, when you have to explain away so much, when you have to explain why an applicant comes in and upfront tells you, I'm, I have left the Hazelhurst School District and I want you to know I have sued them. And then this school district goes and calls the, that superintendent to allegedly get and did get, they said, a negative reference. Well, duh. But then the Department of Justice goes behind, contacts that superintendent who said he never gave a negative reference. Now, Your Honor, there is just too much in this record that shows no good faith. You really have, I mean, to me, it's a separate thing than just compliance. It is the good faith. Freeman Vipskitt says that is important. And that is why the good faith, and it's not just to the court, it's to the public. I know the district court wanted to discount the 565 black individuals who we don't think it should get. You know, district court said, I'm going to discount that. But how do you show the public is not in favor of this? That this district has not demonstrated to the public that it has acted in good faith compliance. 565 and one in favor. Tom Duncan, who got that position. Counsel, you saved time for rebuttal. Oh, I had so much. Thank you, Your Honor. We appreciate it. Spend the day on this. I could. Or 34 years. Good afternoon, Your Honor. Please, the court. Let me ask you about Simpson County. Are there municipal school districts in Simpson County, too? No, sir. So the whole county is? It's a countywide school district. No Mendenhall, no McGee? No, sir. Mendenhall and McGee, although great rivals, are part of the same school district. In this instance, the Simpson County School District. I don't know if this is all the students in the county or not. Thank you, Your Honor. I'm John Hooks from Adams and Reese, and it has been my honor to help shepherd the school district on its path, its journey toward unitary status for about the last decade. Was Holmes Adams another shepherd for a while? He is a shepherd, a fellow shepherd, Your Honor, and he and I together have provided legal advice to the school district over the past. Do you concede that the sheep have been wayward on occasion? We may not stick with this long, but I'm sorry. No, I'm just there are a number of examples of irregularities that have been pointed out, many examples of irregularities that did not follow the policy. Do you? I mean, what do you do? You say that that doesn't matter, or do you dispute each and every one of those? Your Honor, this is a case rich in detail, as you can see, and there are a myriad of employment matters that are taken up by the district court and sifted through with great care and great detail. I don't think, according to Miss Keyes, that we're held to a standard of absolute perfection with regard to each and every employment matter. The school district literally hires hundreds of people over a relatively small number of hires here, and in this regard, Miss Keyes has pointed to no instance in which the district court, in sifting through and analyzing the record, made clear error with regard to any of the facts of the case. What the district court did look at is whether those facts, as he appreciated them, rose to the level of a violation of the consent decree, and he found, after looking at it in two different fairness hearings, that there was no violation of the consent decree. I don't think the district, and I do concede that the district did not, in every instance, apply its procedures in terms of applications and so on 100% correctly. That's obvious, and that's, according to the district, no indication of a violation of the consent decree in instances. But, at the same time, I think it's important to ask whether any of those violations rise to the level of a violation of the consent decree. And I would remind the court, respectfully, that each and every one of the employment decisions or employment applications that came before the school district has in place an entire machinery under federal law of which the court, or experts in this area, Title VII, Title IX, Section 1983, the EEOC, can redress those grievances individually, and in some instances, there were a couple where individuals pressed forward with charges with regard to that. But did those have any relationship to the efforts to become a monetary system? Your Honor, I don't think so. I think that an individual can maintain, from his or her perspective, the idea that his application, because it was not accepted as a result of some racial issue, and charged forward with that, without indicating that the district was somehow nefarious in actually discriminating against the individual or failing to provide or follow its own procedures according to the consent decree. Counsel, I'm not sure exactly what you're saying. Your firm does an awful lot of school work, and you certainly have unitary districts in which there are claims, maybe even successful on the same claims, of racial discrimination or something else. But I think if you're still operating on a consent decree, if any of these are actually racial discrimination, that's a very strong reason not to say that the district court was right in ending the consent decree. So it does seem to me that regardless of these other remedies, because you're still operating on the consent decree, still in an effort to desegregate ancient, or these sorts of things, order, it's very important that none of these really rise to the level of discrimination. Now, it's a different issue, it seems to me, of whether it is some noncompliance in a technical way, a real way, but a technical way, with the consent decree. She says the worst example of this is the hiring of the basketball coach. Why do you say that? Your Honor, that had to do with the hiring of Callie Dantzler. And in the briefing, there's quite a bit of the machinations back and forth about why that happened, about why Ms. Dantzler was not qualified to take on certain responsibilities with regard to her position, about competing positions, about when the applications were accepted, and so on. I think one of the biggest issues in the case is that back in 1982, when plaintiff intervenors were admitted as intervenors in the case, it was clear at that time, according to the docket, the district court said, I'm admitting the plaintiff intervenors on condition that they take direction from and cooperate with the U.S. Department of Justice. The Department of Justice is the one who, for the longest time, has been in the trenches here, looking over these specific applications that were submitted before anyone was hired at the district who had an application score that fit within the criteria of the consent decree and passed off on it as not having an objection. The Department of Justice, however, is not here as an appellant in this case because they did not challenge or they did not object to the district's motion for unitary status. I think that's a very important fact. Did they, before the 2014 or 15 order, did they object at that time? No, sir, they did not. They have not objected to either of the last motions for unitary status that the district submitted. And, Your Honor, I would also, to return to your original question, I'm not trying to be dismissive of any idea that a discrimination or an act of discrimination on the part of the district would not somehow also indicate a lack of awareness or lack of follow-through or lack of compliance on the part of the district with regard to the desegregation decree. Those two things may well overlap. But in this instance, Your Honor, there is no such act, there is no such event, there is no such act of discrimination that someone has brought forward and said, well, this is confirmation of the district's failure to comply with the consent decree with regard to employment. Does it have to be that, though? Could it just be cumulative failure to follow the decree's procedures? If you have enough of them, even if they're small deviations where different people are hired, that shows a lack of good faith. Even if it doesn't show that it's a race of the person that got it versus the other person. No, I don't think so, Your Honor. Why not? There are two good examples. Well, the case of Roma Morris is an example that Ms. Keyes brought up. Ms. Keyes claimed that the second that Greg Pace became superintendent, he returned to the good old boy, cronyistic ways that she described. Well, Roma Morris was a white female. She had applied for director of the vo-tech position. Mr. Pace had an honest difference of opinion regarding her qualifications for that position. He believed that the individual who had been second in command at that school for a nine-year period should take the reins of leadership of that school, from which Mr. Pace had ascended to the position of superintendent. That information was presented to the Department of Justice and to the plaintiff intervenors. The Department of Justice did not object to it. The plaintiff intervenors did. They submitted an official objection to the district court. The only one they submitted, the United States has not submitted one, by the way, in this litigation. And at that point in time, the district reconsidered its position and said, okay, we will consent to hiring Roma Morris. Another example had to do with Spurgeon Bannion, whom Ms. Keyes makes as sort of the poster child of her efforts. Spurgeon Bannion was someone that our firm had been involved in terminating from two other school districts for such things as embezzlement and abuse to students. That information was communicated to the United States. They offered no objection to our not hiring Spurgeon Bannion and thought that was legitimate. So, Your Honor, I don't know that we see at all, I don't concede that we see a pattern of noncompliance with the consent decree. Okay, but I'm asking, I guess I'm asking a legal question. If there is a pattern of noncompliance with the consent decree, even if that pattern doesn't manifest itself in what can be seen as racial discrimination, was it in error for the court to define this unitary? What does the case law say? If there's a, does it have to follow the consent decree? It's similar to questions that Southwick has asked. I can't tell whether the law is that it has to follow the consent decree or whether it has to be discriminatory, I mean, has to not be discriminatory. Which is the standard? Your Honor, I believe the consent decree is in place to answer the ultimate question of whether the school district has eliminated the vestiges of discrimination to the extent practicable. It is a tool of the larger efforts to discriminate, to dismantle the jury system. But a failure to follow, a failure to follow a tool over a period of time, does that arise in the case law as being good enough reason to say you're not unitary still? I mean, are you, or do you need something more? Your Honor, I think you need an evidence or a pattern of failure to comply, and that pattern needs to evidence failure to comply based on racial discrimination. Does it? Is there a case that says that? What's the case law on this? That's what I'm asking. Well, Your Honor, to be fair, with regard to actual consent decrees like the one we have here, they are an oddity in the law to a large extent. We don't have very many of them. And it's just south related to, our firm is fortunate to represent a number of public school districts in desegregation cases, probably two dozen of them at any given time. And in no other case do we have an animal like we have here, an employment discrimination addendum really to the desegregation decree, because of course in this case the district has long been found unitary in all other respects. But Your Honor, in this instance I would submit that the district has not, there has not been pointed out by the district court failures on the part of the district with regard to complying with the desegregation decree. Okay, but assuming arguendo that it has, I'm wondering, does that mean that we have to remand? No, ma'am. That's why and why not? Because I believe that the desegregation decree, the 2012 consent decree and by extension other years, that consent decree is in place to remedy de jure discrimination in the school system. That's the purpose of it. That's the intent of it. And so what we look to is a question of, well, if there are failures, assuming there are, do those failures amount to discrimination or do they amount to a vestige of the de jure system? Well, and I'm glad to hear about your beliefs about it, and I'm not trying to be snotty about it, but is there some authority, a treatise, or someone else who's ever said what you're  Or is this just your position? I would go back generally to answer your question to desegregation law. And I would look at cases like Dowell, I would look at cases like Rufo, I would look at cases like Hull v. Quitman that all say perfection, and I'm paraphrasing here, perfection is not the standard in the late phases of carrying out a desegregation decree. That school districts aren't charged with heroic measures of compliance to the absolute standard of perfection with regard to any of the arguments. Well, this is far from, we're not near perfection here. I mean, they've got people getting jobs that they're trying to get near retirement and creating extra jobs for them, and other people switching the names of their jobs so they can hire someone else in a different position. There's all kinds of interesting things in this. This is far from perfection. But the question is whether or not it matters or not. Is there evidence that there is deceit on behalf of the school district because it's said that they had gotten a reference from that other school superintendent that was being sued, and the DOJ confirmed that that reference had not occurred, and is that, would that be an evidence of bad faith if they're being deceitful in the process? Or is that not the accurate statement of the record? Your Honor, one of the phenomena that we've seen in this case is a sort of mission creep on the part of plaintiff intervenors who insist that there are certain obligations on the part of the district when in fact they're not. And one of the things Ms. Keyes has insisted on is that if the school district receives some type of negative reference upon making some type of background inquiry, that the school district is supposed to reach out to that person and demand that that person submit in response a written confirmation of the negative reference. In the experience of the human resources director of the district, who by the way is African American, she says there's no way somebody's going to talk to me honestly and openly and freely and then turn around and write that up in response and confirm what they've said about the employee. So oftentimes you do get instances where a prospective or a former employer gives a negative reference and then later on denies having given that negative reference. That's not uncommon in the world of human resources. So your position is that it's not deceit on the part of the school district. It's deceit on the part of the person who was given the negative reference. Is that the answer to this particular situation? Yes, Your Honor. I do believe that. And I also believe that in that particular instance, that matter was thoroughly vetted and information was sent to the Department of Justice about that. And the Department of Justice did not file an objection with the district court about that because in this consent decree there is the possibility that plaintiff intervenors and the United States Department of Justice can actually submit a formal objection to the district court with regard to any of these hires. The United States did not submit any objections with regard to these hires. Well, Mr. Hooks, you've said that several times. I was thinking of the resource allocations of U.S. attorneys and the Department of Justice and whatever else, and I'm not sure how much this is the focus now. And regardless of what DOJ is doing, we have to be sure as a court that the consent decree is being properly implemented and the effects of de jure segregation are at an end. Are you seeing them? I'm asking for outside of the evidence, record evidence. I want to ask that. I'm just wondering how active DOJ is in these sorts of questions now. One of the things that concerns me and struck me as odd in this case is so soon after, was it Judge Barber in 2014 or 2015, denied unitary status, I think it was 2014, and then in 2015 you seek it again. It seems very quick. What you generally are looking at is evidence of actually having overcome the vestiges some consistent lengthy period of time and bringing a new suit just a year or year and a half after a previous rejection of that argument by the district court seemed awful fast. What do you say is the evidence, not just of these particular hires, what length of time is your argument based on the rest of the record that this school district has in fact been operating consistent with the consent decree with whatever kinds of occasional mistakes that are made? Your Honor, may I address both of your concerns you've expressed, the first having to do with the attention of the Department of Justice on this? That was an observation, but if you have an answer to that from this record as opposed to I represent 28 school districts or whatever you said and I know in 20 they've done this, that's not in this record and I don't want to know that. Your Honor, very much tethered to this record and a central part of it are all of the machinations back and forth between the school district, our law firm and the Department of Justice and the private plaintiffs with regard to each and every one of these hires. And what we did was any time there was a recommendation for employment by the school district from someone who was not the highest rated applicant, we sent all of the interview guides, all of the supporting documentation, all of the references and so on to the plaintiff intervenors and the Department of Justice to see if they had any objection with regard to that. There was literally a flurry of communication going almost daily between these entities, including the Department of Justice. What years are we talking about when that was happening? Your Honor, between 2012 all the way up until the last ruling on the unitary status motion in 2016. And, Your Honor, it's literally thousands of pages of documentation that went back and forth. And Tori Cummings was the lawyer for the DOJ. And, Your Honor, I would submit to you that this must have been occupying 60% to 70% of her time it seems. And she and I had conversations in which she reported the tremendous volume of work the Department of Justice was doing on this particular case. So this is an instance in which the Department of Justice was doing much more than you might find in a typical desegregation case. They were actually entering into almost a daily communication with the school district about these particular hires. So the school district was very much involved in this. I know we're cutting you off, but your time is running out. Does DOJ ever join a motion for unitary status? Because they didn't do that here. Your Honor, they do on occasion join in motions for unitary status. And they did not here. They did not here. Which is also some suggestion. They simply elected not to oppose it. Was that because—we don't know, though, if that's because they figured they were getting zealous advocacy by the intervenors, so they didn't need to do anything. Well, actually it was the United States who was more zealously advocating throughout the course of the litigation, not the plaintiff intervenors. In fact, from about 2005 until about 2013, the plaintiff intervenors were absent from the litigation and did not participate in litigation. And that's part of the record. I think Judge Southwick had a second question or something. Do you remember it? Your Honor, I don't. I'm sorry. What was your second question? I don't know. It will come to me. But why don't you move on? Well, in conclusion, I will say that this is a school district that has complied with the desegregation decree and has worked very hard, tirelessly in fact, to submit thousands of pages of documents with regard to these various hires. We see, Your Honor, there has been absolutely no indication from the Department of Justice of any concern that they have. And I think importantly, the plaintiff intervenors themselves don't even challenge some of the most significant progress the district has made with regard to complying with its desegregation obligations, for example. They don't dispute the fact that the district went up from seven African-American administrators to 14 over a six- or seven-year period. They don't dispute the information put forward about generally the number of African-American teachers there. They don't dispute the fact that the district went forward and recruited at historically black colleges and universities. And, Your Honor, to answer your question, I have remembered it, with regard to the compliance with various aspects of the interview guides, I think it's important to note that the district court, when the district court looked at this in the first motion for unitary status in 2011-2012, the district said, I'm sorry, 2014, the district court said that he was concerned about this issue of the interview guides that the district had failed to utilize properly. The school district, that is, corrected that procedure and put in place the interview guides. And as stated in the court's order, the district was permitted to resubmit its application for unitary status a year later. So that was… Say again, are you saying in the 2014 order the judge said what you just indicated? Yes, sir. Yes, sir. And that had been an understanding all along that the consent decree governing employment would not exist forever. And there was this idea that the district would make applications at certain periods of time to dissolve the employment consent decree. And so here, Your Honor, once that issue was corrected over the course of that year, then the only concern that the district court ever expressed about the district's operations under the consent decree had been corrected so that the district was able to move forward at that time, according to the district court, and achieve unitary status. I need to wrap it up. Thank you, Your Honor. Thank you. Thank you. Your Honor, the instance that I said was a clear violation, the hiring of the basketball coach, was not Callie Dantzler's. It was the hiring of Ben Johnson by Principal Sanders. And if you look at tab 17 in the record excerpts, and it's the hiring of Ben Johnson. And that's where he dropped down and went to LaQuinda Nichols first and asked her if she wanted a job. And the thing is, when you look at these, this is what we might get, this here's who's being recommended. Now, our assumption was the consent decree was being followed, that all these people were interviewed and the top person was given the job. But, you know, and if the top person doesn't get the job, then we could request additional information. So in many instances, we didn't request additional information, thinking that this, the procedure was followed. Only at the hearing did it come out that this does not reflect that the top people were hired and everybody interviewed at the same time, and the final invitation was given to the highest rated applicant. So that, the Ben Johnson hire is the key one. But the other one I want to bring to the Court's attention is Billy Brown's situation. Billy Brown had been at the, at Mendenhall Junior High for a number of years, and he left the school system. But then he came back to apply for a position at our Achievement Center, which has very, very few students, I think maybe 80, something like that, very few students. And he actually called Miss Skiffer and said, that was his former principal, and said, I'm thinking of applying, would you give me a recommendation? And she said yes. And she testified that when she was called by Miss Christian, she said, well, you know, I think he'd do good in a smaller setting. You know, he did have some issues at the school, and we dealt with some organizational things, but I felt he would do well at a smaller school. Miss Christian took that as a negative reference. He didn't even get a chance to be interviewed. And a white was given, well, there were two positions available, and whites got the job. So, you know, to me, again, the manipulation here of this and having to constantly stay vigilant. Yes, we did, we did object to Roma Morris. The school system was going to give this position, Mr. Pace was going to give this position to his friend, and we have an e-mail in the record that says the school board's going with Mr. Pace. You know, we had to file something in court to get that done right, and only then did they back off. We had to object on the Teresa Barnes situation and this interviewing or talking to her former superintendent when she was up front about the lawsuit. The school district, you know what they did? They offered her the position three days before school started, and a principal position. So they'll say, oh, she declined the position. But, you know, they manipulate things. So, yes, Your Honor, we have been vigilant. We have, in these last few years, you know, been trying to get the information, but why? We shouldn't have to be. If the Department of Justice decides they don't want to pursue, we're in this case because maybe they don't adequately represent. All right? So we went ahead, and I think the court has vindicated us in many instances, or even their own behavior has. Your Honor, I think the other instances of showing a lack of good faith, when you have somebody who has given someone a recommendation for which that person got points and then turns around and interviews that person and that person gets points, that's not a good faith hiring procedure to allow the people who gave you recommendations to interview and get you hired. But, you know, they'll throw up their hands. Well, nobody says we couldn't do that. Yes, the consent decree says the principal and the superintendent do the hiring. Not all these other recommendations by people who are, you know, who are folks who've already gotten points, you know, for their recommendation. Your Honor, I think the statistics that they want to raise, you know, about a possible that, you know, we've done all this, we have this increase, you know, yeah, there has been some increase. But in 2013, there were 12 of 34 black administrators. In 2016, there were 13 of 33. One. And we have numerous instances of black administrators being passed over positions. And 13 of the 33 black faculty, I'm sorry, were hired by, I'm sorry, 13 of the black administrators. And this is all in the March 30th, 2016 court report. Eight, 13 of the black administrators reflected there, eight were hired by black principals. All right? Two of the schools don't even have a black administrator. We want to monitor, too. I think that's just like in the Moore v. Tangipahoa. They need a monitor. Thank you, Your Honor. Thank you. We have your argument. This case is submitted.